UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAMAINE GRIFFIN,

                Petitioner,                                Hon. Janet T. Neff

v.                                                  Case No. 1:08-CV-833

CINDI CURTIN,

                Respondent.

_____/

**REPORT AND RECOMMENDATION**

        This matter is before the Court on Griffin's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Griffin's petition be **denied**.

**BACKGROUND**

        This matter arises from the August 8, 2005 homicide of Ronald Weaver in connection with the theft of his car, a Mercedes Benz. As a result of events that occurred on or about August 8, 2005, Petitioner was charged with: (1) felony murder; (2) first degree murder; (3) carjacking; (4) felonious assault; (5) possession of a firearm during the commission of a felony; and (6) being a felon in possession of a firearm. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Eric Henderson**

As of August 9, 2005[1], Henderson was employed as the property supervisor of the Jeffersonian apartment buildings. (Trial Transcript, November 30, 2005, 134). Late that afternoon, Henderson observed two men chasing Petitioner through the swimming pool area and into "the parking structure." (Tr. 134-36). At this juncture, Petitioner was not injured. (Tr. 137).

Shortly thereafter, the two men that had been chasing Petitioner "came running out" of the parking structure, followed "right after" by Petitioner who was "kind of staggering." (Tr. 137-38). Petitioner had "blood around his mouth and on his knuckles." (Tr. 138). Fearing that Petitioner was injured, Henderson instructed him to sit down. (Tr. 138). As he was sitting there, Petitioner began talking. (Tr. 139-40). Petitioner stated, "the guy didn't have to die" and that he "drove his Mercedes" and "had fun." (Tr. 140-41). Petitioner then stated, in a "resigned" tone, "well, I'm going back to jail." (Tr. 141-42).

The two men that had been chasing Petitioner later returned. (Tr. 142). They were "agitated and angry" and said that Petitioner "had tried to bust the ignition on their mother's car" and had "taken her purse and ran." (Tr. 142-43). The men "got into another scuffle" with Petitioner, but departed when the police arrived. (Tr. 143-44).

**Lawrence Dixon**

As of August 9, 2005, Dixon was working as the doorman at the Jeffersonian Apartments. (Trial Transcript, November 30, 2005, 155-56). That afternoon, Dixon observed a

---

[1] The events of August 9, 2005 are apparently not directly related to the event for which Petitioner was convicted. They are relevant for certain statements Petitioner made about the events on August 8, 2005.

group of men chasing Petitioner through the apartment complex. (Tr. 156). The men chasing Petitioner later "ran past" Dixon. (Tr. 157). Petitioner subsequently approached Dixon and "collapsed" in his arms. (Tr. 157). Petitioner "had a little blood on the corner of his mouth and he had scars on his body." (Tr. 157).

While Petitioner was laying on the ground, he made several statements. (Tr. 158-59). Petitioner stated, "he didn't have to die" and "all that blood was on me." (Tr. 159). Petitioner later threw some car keys and said, "these are the keys to the Benz." (Tr. 159). Petitioner also stated that he would be returning to jail. (Tr. 160-61). The men who were chasing Petitioner returned and indicated that they were "trying to get at" Petitioner because "he was trying to steal their mother's vehicle." (Tr. 161-62).


**Alleda Mull**

On August 8, 2005, Mull was visiting friends at 1472 Robert Bradby Drive, Apartment D. (Trial Transcript, November 30, 2005, 167-69). Between 6:30-7:00 p.m. that evening, Mull heard "three or four gunshots." (Tr. 168). It sounded as if the gunshots originated nearby. (Tr. 168). Approximately 3-4 minutes later, Mull saw a black Mercedes "come speeding by." (Tr. 169-70). Mull noticed that the vehicle's trunk "was up." (Tr. 169). The driver then stopped the vehicle, closed the trunk, and sped away at a high rate of speed. (Tr. 171). Mull noted that a man named Mr. Weaver, who lived in a nearby apartment, owned a black Mercedes. (Tr. 173-74).

**Annette Bailey**

On August 8, 2005, Bailey was visiting with a friend who lived on Robert Bradby Drive. (Trial Transcript, November 30, 2005, 175-76). Sometime between 6:30-7:30 p.m., Bailey heard "about three" gunshots. (Tr. 176). A few minutes later, Bailey saw a black Mercedes "speeding down Robert Bradby Drive." (Tr. 176-77). Bailey noticed that the "trunk of the car was up." (Tr. 177). The driver then stopped the vehicle, closed the trunk, and drove away at a "very fast" speed. (Tr. 177-79). Bailey recognized the Mercedes as belonging to Mr. Weaver. (Tr. 179). Later that evening, Bailey learned that Mr. Weaver had been shot. (Tr. 179).

**Colin Lee**

On the evening of August 8, 2005, Lee was working on a car outside a residence at 5782 Seminole. (Trial Transcript, November 30, 2005, 182). At approximately 8:00 p.m., Lee heard five gunshots. (Tr. 182-83, 187). Lee immediately turned his attention to where the shots originated and saw a "black male running up the alley" and through two nearby fields. (Tr. 183, 187). The man was carrying a gun. (Tr. 184). Lee reported to the police that the black male he saw running up the alley was medium-complected, between the ages of 18-28, approximately 5 feet 11 inches tall, and weighed approximately 165 pounds. (Tr. 188-89). Lee walked up the alley and saw a black Mercedes. (Tr. 183-84).

**Christopher Nieman**

As of August 9, 2005, Nieman was employed as a City of Detroit Police Officer. (Trial Transcript, November 30, 2005, 190-91). That afternoon, Nieman was dispatched to the

Jeffersonian Apartments where he arrested Petitioner. (Tr. 191). Nieman subsequently spoke with Nakyah Kidd, who stated that she observed Petitioner attempting to steal a vehicle. (Tr. 191-93). When Petitioner realized that he "had been made," he "grabbed" a purse from inside the vehicle and fled. (Tr. 193). Petitioner was then chased to the Jeffersonian Apartments. (Tr. 193-94).

After Petitioner was arrested, he began making unsolicited comments about a murder. (Tr. 194-95). Petitioner stated that "he knew who shot the guy in the Mercedes." (Tr. 195). Petitioner stated that "[t]he man didn't have to die. The worst thing that should have happened is he should have been shot in the leg." (Tr. 196). Petitioner stated that he had been driving the Mercedes "down Lafayette at 120 miles per hour." (Tr. 195-96). Petitioner also stated that he abandoned the Mercedes at Seminole and Gratiot and then attempted to "shoot the gas tank so the car would burn." (Tr. 196).

**Gary Roache**

On the evening of August 8, 2005, Roache was standing outside on Seminole Street. (Trial Transcript, December 1, 2005, 10). At approximately 8:00 p.m. that evening, Roache heard 3-5 gunshots. (Tr. 10). Approximately 2-3 minutes later, Roache saw somebody running from a nearby alley. (Tr. 11). Roache described the individual as a black male, with medium-complexion, approximately five feet six inches tall, and weighing approximately 160 pounds. (Tr. 12-13).

**Dr. Cheryl Loewe**

Dr. Loewe testified that she was the Deputy Chief Medical Examiner for Wayne County. (Trial Transcript, December 1, 2005, 17). She was qualified by the court to testify as an

expert in forensic pathology. (Tr. 18). Dr. Loewe performed the autopsy on Ronald Weaver. (Tr. 19). The doctor observed a single gunshot wound on Weaver's cheek. (Tr. 21). There was a "muzzle imprint and soot in the wound, which indicates the gun was held up to his cheek at the time it was fired." (Tr. 21). Dr. Loewe determined that such was evidence that "Mr. Weaver was executed, or shot point blank." (Tr. 21). The doctor observed that this particular injury was fatal, as the bullet passed through the major areas of Weaver's brain. (Tr. 22). Dr. Loewe determined that "[t]here were no other injuries to his body and no natural diseases present." (Tr. 21). Dr. Loewe characterized Ronald Weaver's death as a homicide. (Tr. 25).

**Marcia McCleary**

McCleary testified that she was employed as a latent fingerprint examiner for the Detroit Police Department. (Trial Transcript, December 1, 2005, 26-27). She was qualified by the court to testify as an expert in latent fingerprint identification. (Tr. 28). McCleary testified that Petitioner's and Ronald Weaver's fingerprints were both located on "the rear driver's side door."[2] (Tr. 29-30).

**Verna Kidd**

On the afternoon of August 9, 2005, Kidd was in the process of moving. (Trial Transcript, December 1, 2005, 35-36). Her vehicle was parked on the street in the general area of the Jeffersonian Apartments and her purse was inside the vehicle. (Tr. 35-37). Kidd then heard her daughter "hollering." (Tr. 36-37). When Kidd looked in the direction from which the hollering

---

[2] McCleary was never asked, however, to identify the vehicle from which the prints in question were recovered.

originated, she saw her daughter "chasing someone."  (Tr. 37).  Kidd attempted to follow her daughter and when she turned the corner she saw her purse laying in the street.  (Tr. 37-38).  Kidd saw that "a couple of people" that were helping her move had joined in the chase.  (Tr. 38).

**Nakyah Kidd**

On the afternoon of August 9, 2005, Kidd and her family were in the process of moving.  (Trial Transcript, December 1, 2005, 40).  As she was helping, Kidd saw somebody breaking into her mother's car.  (Tr. 41).  The man saw Kidd, at which point "he ran."  (Tr. 41).  Kidd then began chasing the man.  (Tr. 41-42).

**Margie Weaver**

As of August 8, 2005, Weaver resided at 1516 Robert Bradby.  (Trial Transcript, December 1, 2005, 44-45).  Between 6:30-7:00 p.m. that evening, Weaver was in her kitchen when she heard her garage door open, immediately after which her husband, Ronald Weaver, drove his black Mercedes into the garage.  (Tr. 44-46).  Weaver then heard her husband say, in a "very loud" and "distress[ed]" voice, "what do you want?"  (Tr. 46).  Margie Weaver then opened the door to the garage and saw Petitioner pointing a gun at her husband's head.  (Tr. 47-49).  Petitioner and Ronald Weaver were standing approximately four feet apart near the rear driver's side door.  (Tr. 49).  When Petitioner saw Margie Weaver, he pointed the gun at her.  (Tr. 50).  Ronald Weaver then told his wife to "close the door."  (Tr. 50).  Margie Weaver closed the door, immediately after which Petitioner shot her husband.  (Tr. 50-51).  Petitioner then drove away at a high rate of speed in Ronald Weaver's Mercedes.  (Tr. 52).

**Constance Slappey**

As of August 9, 2005, Slappey was employed as City of Detroit Police Officer. (Trial Transcript, December 1, 2005, 80). At approximately 6:15 p.m. that evening, Slappey interviewed Petitioner. (Tr. 80-82). When Slappey met Petitioner, she immediately observed that he had been beaten. (Tr. 90-91). Before asking Petitioner any questions, Slappey first advised him of his Miranda rights. (Tr. 83-87). This was witnessed by Investigator Dale Collins. (Tr. 84). After acknowledging that he understood his rights, Petitioner agreed to speak with Slappey. (Tr. 87). The subsequent exchange between Slappey and Petitioner was as follows:

Q:    Tell what happened yesterday when you were on Robert Bradby Drive.

A:    I was in a desperate mind-set I went over there to get a car. I saw him when he was pulling into his driveway. I went behind and played it off, and told him something was coming out of his exhaust pipe. He got out of the car and came to the back of the car and looked down. Then I pulled the gun on him and told him to give me his money. He said, "Man, get out of here with that." I kept telling him to give me the money but he wouldn't. Then his wife came to the door. She was on the phone and she ducked back in the house. I went into shock and then I aimed at him. I remember me shooting, and he stood there and then he fell. I then got in the car and I left. Before I got in the car I moved him out of the way so I wouldn't run over him. I drove straight down Lafayette and jumped out of the car on a street I don't remember. When I got out of the car I went to the back and tried to shoot the gas tank. I ran out of bullets.

Q:    What color and make of car did you take?

A:    A black Mercedes.

Q:    How many times did you shoot him?

A:    One.

Q:    Why did you try and rob him?

<div style="margin-left: 2em;">

A:       I needed money for my family.

Q:       What kind of gun did you use?

A:       A 38, black in color.

Q:       Where is the gun now?

A:       At the house on Garland and Jefferson, almost the middle of the block.

Q:       Did you mean to shoot him?

A:       No

Q:       Did you touch the car?

A:       I touched it all over.

</div>

(Tr. 88-89).

Slappey reduced Petitioner's statement to writing, but Petitioner refused to sign his statement because "he felt as if signing it he was signing his life away." (Tr. 90). Petitioner then requested to speak with his mother, who was contacted by another officer. (Tr. 90). When Petitioner's mother arrived at the station, Petitioner did not tell her that he had been beaten before his arrest, but instead told his mother that the police had beaten him. (Tr. 91).


**Lori Briggs**

As of August 9, 2005, Briggs was employed as an evidence technician for the City of Detroit Police Department. (Trial Transcript, December 1, 2005, 111). On that date, Briggs retrieved several fingerprints from the rear driver's side door of a Black Mercedes. (Tr. 111-12). Briggs also discovered "a couple of suspected bullet holes in like the rear bumper area" of the vehicle, as well as "suspected blood" on the driver's side of the vehicle. (Tr. 114-15).

**Velma Tutt**

As of August 8, 2005, Tutt was employed as a City of Detroit Police Officer. (Trial Transcript, December 1, 2005, 119-20). That evening, Tutt was dispatched to Ronald Weaver's residence. (Tr. 44-45, 120). An examination of the garage revealed evidence of a struggle. (Tr. 121). Tutt also observed a "very large pool of blood" on the floor, through which a vehicle had been driven. (Tr. 121-22). Tutt was then dispatched to an alley in the vicinity of Medbury and Iroquois, where she discovered a black, four-door Mercedes automobile. (Tr. 123). The trunk and driver's door were both open. (Tr. 123-24). Tutt also observed a suspected bullet hole in the rear bumper. (Tr. 124).

**Dale Collins**

As of August 9, 2005, Collins was employed as an investigator with the City of Detroit Police Department. (Trial Transcript, December 1, 2005, 126-27). At approximately 6:15 p.m. that evening, Collins witnessed Officer Slappey inform Petitioner of his Miranda rights. (Tr. 127-28).

**Stipulations**

The parties also stipulated to the following facts: (1) an expert in firearms examination received from the Wayne County Medical Examiner's Officer one .38 caliber bullet fragment; and (2) as of August 8, 2005, Petitioner was a prior felon, making him ineligible to carry or possess a firearm. (Trial Transcript, December 1, 2005, 129-30).

Following the presentation of evidence, the jury found Petitioner guilty of first degree

felony murder, second degree murder, carjacking, possessing a firearm during the commission of a felony, being a felon in possession of a firearm, and felonious assault. (Trial Transcript, December 2, 2005, 11-12). Petitioner received a sentence of life in prison without the possibility of parole on the felony murder conviction, and lesser sentences for the various other convictions. (Sentence Transcript, December 19, 2005, 13-14). Petitioner appealed his conviction in the Michigan Court of Appeals, asserting the following claims:

I.      The trial court violated appellant's due process rights by admitting four photographs of the decedent where the danger of unfair prejudice from the gruesome photographs substantially outweighed any probative value.

II.     Appellant's due process right to a fair trial was violated where in a non-responsive answer, the pathologist who performed the autopsy testified that the decedent was "executed." Defense counsel offered ineffective assistance under the state and federal constitution where he failed to object to and move for a mistrial based upon the improper testimony.

III.    The trial court reversibly erred in denying the defense motion for a directed verdict because the prosecution failed to produce legally sufficient evidence of defendant's guilt beyond a reasonable doubt, both in terms of identification of appellant as the perpetrator.

IV.     The trial court violated appellant's double jeopardy rights under the United States and Michigan constitutions when it sentenced him for first degree felony murder and the underlying felony of carjacking.

V.      Appellant's convictions and sentences for two counts of murder for the murders of just one person violates the constitutional protection against double jeopardy.

The Michigan Court of Appeals affirmed in part and vacated in part Petitioner's

convictions. *People v. Griffin*, 2007 WL 1345864 (Mich. Ct. App., May 8, 2007). Specifically, the court concluded that "[c]onvictions of both felony murder and the underlying felony offend double jeopardy protections." *Id.* at *4. The court further concluded that "[m]ultiple murder convictions arising from the death of a single victim violate double jeopardy." Accordingly, Petitioner's convictions and sentences for carjacking and second degree murder were both vacated. *Id.* Petitioner's other convictions were affirmed. *Id.* at *1-4. Asserting claims I-III above, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Griffin,* No. 134164, Order (Mich., Sept. 10, 2007). On September 3, 2008, Petitioner initiated the present action in which he asserts claims I-III identified above.

## STANDARD OF REVIEW

Griffin's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court

13

unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does not apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated,

where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.        Sufficiency of the Evidence

Petitioner asserts that he is entitled to relief on the ground that the prosecution failed to present sufficient evidence to sustain convictions for first degree murder or for felony murder.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor

of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Pursuant to Michigan law in effect at the time of Ronald Weaver's murder, an individual was guilty of first degree premeditated murder if the following elements were satisfied: (1) the defendant intentionally killed the victim, and (2) the killing was deliberate and premeditated. *People v. Wofford*, 492 N.W.2d 747, 749 (Mich. Ct. App. 1992). Premeditation and deliberation require "sufficient time to allow the defendant to take a second look." *People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992). Premeditation and deliberation may be inferred from the circumstances surrounding the killing. Furthermore, premeditation may be established through evidence of the following factors: (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the killing. *Id.*

Pursuant to Michigan law in effect at the time of Ronald Weaver's murder, an individual was guilty of first degree felony murder if the following elements were satisfied: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result (i.e., malice), and (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in Mich. Comp. Laws § 750.316. *See People v. Nowack*, 614 N.W.2d 78, 82 (Mich. 2000). The requisite intent can be inferred from the relevant facts and circumstances. Where a defendant "intentionally set[s] in motion a force likely to cause death or great bodily harm," malice may be inferred. *Id.*

Carjacking is specifically enumerated in Mich. Comp. Laws § 750.316. As of the

date Petitioner acted, the elements of carjacking were as follows: (1) the defendant took a motor vehicle from another person, (2) the defendant did so in the presence of that person, a passenger, or any other person in lawful possession of the motor vehicle, and (3) the defendant did so either by force or violence, by threat of force or violence, or by putting the other person in fear. *See People v. Davenport*, 583 N.W.2d 919, 920-21 (Mich. Ct. App. 1998).

Petitioner's argument is premised on his belief that Margie Weaver's testimony identifying Petitioner as her husband's killer is somehow unreliable. As previously noted, however, in assessing a sufficiency of the evidence claim, the Court may not weigh the evidence or assess the credibility of the witnesses. Margie Weaver identified Petitioner as her husband's killer. The jury obviously believed her testimony and this Court may not substitute its judgment for that of the jury. The evidence detailed above, when viewed in a light most favorable to the prosecution, is more than sufficient to support a conviction for first degree murder and for felony murder. As the Michigan Court of Appeals concluded:

> Ronald's wife, Margie Weaver, watched defendant point a gun at Ronald while in the garage of their home. Ronald told Margie to close the garage door and when she did she immediately heard shots fired. Ronald was fatally shot and defendant drove off in Ronald's car.
>
> The evidence was sufficient for a jury to conclude that the elements for a first-degree premeditated murder conviction were proven, i.e., that defendant intentionally killed Ronald and that the act of killing was premeditated and deliberate. . .Sufficient evidence was presented which would lead a reasonable jury to conclude that defendant acted with premeditation and deliberation. A reasonable jury could infer that defendant's actions were premeditated and deblierate because defendant approached Ronald as Ronald prepared to enter his home. Thus, the evidence was sufficient for a jury to conclude that defendant was waiting for Ronald. Defendant held a gun to Ronald's head during this time and when Margie opened the garage door defendant pointed the gun at her, but returned the gun to Ronald's

head when Margie closed the door. The trial court did not err in denying defendant's motion for a directed verdict on this charge.

The evidence presented was also sufficient for a reasonable jury to conclude that defendant committed first-degree felony murder. . .The evidence was sufficient for a reasonable jury to conclude that defendant acted with malice when he shot Ronald. . .Ronald was shot in the face and it was determined that, based on the muzzle imprint and the soot in the wound, the gun was held up to Ronald's cheek when it was fired. Because of the nature and extent of Ronald's injury, we find that a reasonable jury could infer that defendant acted with malice when he shot Ronald, i.e., that defendant intended to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. We also conclude that a reasonable jury could infer from the evidence that defendant committed carjacking, i.e., that defendant took Ronald's motor vehicle in his presence and by threat of force or violence.

*Griffin*, 2007 WL 1345864 at *3-4 (internal citations omitted).

This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

II.         **Evidentiary Claims**

As noted above, Petitioner has advanced two claims concerning evidence that was admitted at trial.

A.      Photographic Evidence

At the outset of the second day of trial, the prosecution moved for the admission of four photographs which "document[ed] the injuries on the body of Mr. Weaver." (Trial Transcript,

December 1, 2005, 4). The prosecutor asserted that Dr. Loewe would utilize the photographs in her testimony to demonstrate that when Petitioner shot Ronald Weaver, "the gun was pressed directly against the skin." (Tr. 4-5). The prosecutor asserted that the photographs were "highly relevant to the issues of intent to kill and premeditation and deliberation." (Tr. 5). Petitioner objected to the admission of the photographs, arguing that "they're really more prejudicial than they are probative" and were "designed only to inflame the passions of the jury." (Tr. 5-6). The trial judge disagreed, noting that the photographs were relevant and "not particularly gruesome" and "not graphic in any capacity." (Tr. 5-8). Accordingly, the photographs were admitted into evidence. (Tr. 4, 24). Petitioner asserts that the admission of these photographs violated his right to a fair trial.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, require a "perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).

Because Petitioner has failed to submit the photographs (or copies thereof) for consideration, the Court can only speculate as to their content. It must be noted, however, that habeas relief cannot be granted on the basis of speculation and unsubstantiated assertions. With respect to the general issue raised by Petitioner's claim, courts recognize that admission of photographs of a murder or manslaughter victim, when relevant to an issue at trial, do not deprive a criminal defendant of a fair trial. *See, e.g., Smith v. Sirmons*, 200 Fed. Appx. 822, 826-27 (10th Cir., Oct. 17, 2006); *Villafuerte v. Stewart*, 111 F.3d 616, 627 (9th Cir. 1997); *Davis v. Powers*, 2010 WL 1704729 at *6-7 (N.D.N.Y., Apr. 6, 2010); *Benore v. Berghuis*, 2009 WL 4351476 at *11-12 (E.D. Mich., Nov. 30, 2009).

In rejecting this particular claim, the Michigan Court of Appeals concluded:

The prosecution presented four photographs of Ronald's contact wound. The photographs were admitted for the purpose of showing defendant's intent to murder. Because defendant's intent to murder Ronald was at issue and evidence of a victim's injury is admissible to show intent to kill, the photographs were relevant under MRE 401, and admitted for a proper purpose.

Defendant argues that the probative value of the photographs substantially outweighed the danger of unfair prejudice, but, defendant is mistaken. A prosecutor may not seek to admit gruesome photographs solely to arouse the sympathies or prejudices of the jury. "However, if photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they bring vividly to the jurors the details of a gruesome or shocking

accident or crime, even though they may tend to arouse the passion or prejudice of the jurors."

Here, the relevancy of the photographs was not substantially outweighed by the danger of unfair prejudice. The photographs are an accurate factual representation of the injury suffered by Ronald and the photographs did not present an enhanced or altered representation of the injury. "The trial court is not expected to protect the jury from all evidence that is somewhat difficult to view. The Rules of Evidence provide that the court must only limit that evidence whose probative value is substantially outweighed by the danger of unfair prejudice. In this case, the pictures were [mildly] gruesome; however, they were necessary to the proper determination of the defendant's guilt and were not unfairly prejudicial."

Although defendant further argues that the photographs were unnecessary because Dr. Cheryl Lowe presented testimony discussing Ronald's contact wound, "photographs are not excludable simply because a witness can orally testify about the information contained in the photographs." Defendant also argues that the volume of photographs admitted was improper. However, because defendant has failed to show that the admission of four photographs was excessive and improper, he has failed to support his claim.

*Griffin*, 2007 WL 1345864 at *1-2 (internal citations omitted).

This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.    "Execution" Testimony

As previously noted, Dr. Loewe testified that an examination of Ronald Weaver's body revealed the presence of a single gunshot wound, in which she observed soot and a muzzle imprint, indicating that the gun was held to Weaver's cheek when it was fired. Dr. Loewe concluded

that this evidence demonstrated that Weaver had been "executed, or shot point blank." Petitioner asserts that the admission of this testimony deprived him of the right to a fair trial. The Court disagrees. Petitioner has failed to demonstrate that the testimony at issue "had substantial and injurious effect or influence in determining the jury's verdict" or caused him to suffer "actual prejudice" resulting from a constitutional error. The comment at issue was isolated and cumulative to other testimony. Furthermore, there existed substantial other evidence demonstrating Petitioner's guilt. With respect to this claim, the Michigan Court of Appeals concluded:

> Although defendant argues that Lowe's testimony was improper opinion and expert testimony, Lowe's conclusion that Ronald was "executed, or shot point blank" was based on her experience and training as a forensic pathologist. Because Lowe's conclusion was based on her training and expertise as a forensic pathologist, she did not render improper opinion testimony nor did she render improper "state of mind" testimony. At no time in Lowe's testimony did she state that Ronald's shooter acted with premeditation and deliberation, as defendant alleges. Lowe's testimony was not improper, and therefore, defendant's claim is meritless.

*Griffin*, 2007 WL 1345864 at *3.

This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

III.        **Ineffective Assistance of Counsel**

As discussed in the preceding section, Dr. Loewe testified that the results of her examination revealed that Ronald Weaver had been "executed, or shot point blank." Petitioner asserts that his trial counsel rendered ineffective assistance by failing to object to this testimony or

move for a mistrial in response thereto.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688. In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As previously discussed, the evidence in question was properly admitted. Counsel cannot be found to be deficient for failing to object to (or seek a mistrial in response to) the admission of properly admitted evidence. Moreover, even if Petitioner could establish that his counsel's performance was deficient, Petitioner cannot demonstrate that he was prejudiced by such. The comment in question was isolated, cumulative, and there existed an overwhelming amount of other evidence establishing Petitioner's guilt. The Michigan Court of Appeals rejected this claim,

observing:

> Defendant's ineffective assistance of counsel claim is also meritless. Because defendant has failed to show error and counsel is not obligated to make futile objections, defendant has failed to show that he was denied the effective assistance of counsel.

*Griffin*, 2007 WL 1345864 at *3 (internal citations omitted).

This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Griffin's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: November 8, 2010

 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge